FILED

2022 Sep-09  PM 04:33
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| LISA DITTO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:21-cv-00941-NAD |
| | ) | |
| SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | |
| COMMISSIONER, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER
## AFFIRMING THE DECISION OF THE COMMISSIONER

Pursuant to 42 U.S.C. § 405(g), Plaintiff Lisa Ditto appeals the decision of the Commissioner of the Social Security Administration ("Commissioner") on her claims for disability benefits.  Doc. 1.  Plaintiff Ditto applied for disability insurance benefits and supplemental security income (SSI) benefits with an alleged onset date of February 20, 2019.  Doc. 7-4 at 3; Doc. 7-6 at 1–15.  The Commissioner denied Ditto's claims for benefits.  Doc. 12-3 at 2–3, 8.

Pursuant to 28 U.S.C. § 636(c)(1) and Federal Rule of Civil Procedure 73, the parties consented to magistrate judge jurisdiction.  Doc. 8.  After careful consideration of the parties' submissions, the relevant law, and the record as a whole, the court **AFFIRMS** the Commissioner's decision.

## ISSUES FOR REVIEW

In this appeal, Plaintiff Ditto argues that the court should reverse because the decision of the Administrative Law Judge (ALJ) was not supported by substantial evidence.  Doc. 1; Doc. 12 at 16.  Ditto argues that the ALJ "did not correctly evaluate the intensity and persistence of [her] back pain, neck pain, and migraine headaches" (Doc. 12 at 12), and that the ALJ consequently failed to pose proper hypothetical questions to the vocational expert (Doc. 12 at 14).

## STATUTORY AND REGULATORY FRAMEWORK

A claimant applying for Social Security benefits bears the burden of proving disability.  *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).  To qualify for disability benefits, a claimant must show the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrated by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

The Social Security Administration (SSA) reviews an application for

disability benefits in three stages: (1) initial determination, including reconsideration; (2) review by an ALJ; and (3) review by the SSA Appeals Council. *See* 20 C.F.R. § 404.900(a)(1)–(4).

When a claim for disability benefits reaches an ALJ as part of the administrative process, the ALJ follows a five-step sequential analysis to determine whether the claimant is disabled. The ALJ must determine the following:

(1) whether the claimant is engaged in substantial gainful activity;

(2) if not, whether the claimant has a severe impairment or combination of impairments;

(3) if so, whether that impairment or combination of impairments meets or equals any "Listing of Impairments" in the Social Security regulations;

(4) if not, whether the claimant can perform his past relevant work in light of his "residual functional capacity" or "RFC"; and

(5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4); *see Winschel v. Commissioner of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011).

The Social Security regulations "place a very heavy burden on the claimant to demonstrate both a qualifying disability and an inability to perform past relevant work." *Moore*, 405 F.3d at 1211. At step five of the inquiry, the burden temporarily shifts to the Commissioner "to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform."

*Washington v. Commissioner of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018) (quoting *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)).   If the Commissioner makes that showing, the burden then shifts back to the claimant to show that he cannot perform those jobs. *Id.* So, while the burden temporarily shifts to the Commissioner at step five, the overall burden of proving disability always remains on the claimant. *Id.*

## STANDARD OF REVIEW

The federal courts have only a limited role in reviewing a plaintiff's claim under the Social Security Act.  The court reviews the Commissioner's decision to determine whether "it is supported by substantial evidence and based upon proper legal standards." *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997).

**A.**   With respect to fact issues, pursuant to 42 U.S.C. § 405(g), the Commissioner's "factual findings are conclusive if supported by 'substantial evidence.'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Commissioner of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).

In evaluating whether substantial evidence supports the Commissioner's decision, a district court may not "decide the facts anew, reweigh the evidence," or substitute its own judgment for that of the Commissioner. *Winschel*, 631 F.3d at

4

1178 (citation and quotation marks omitted); *see Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) (similar).  If the ALJ's decision is supported by substantial evidence, the court must affirm, "[e]ven if the evidence preponderates against the Commissioner's findings." *Crawford*, 363 F.3d at 1158 (quoting *Martin*, 894 F.2d at 1529).

But "[t]his does not relieve the court of its responsibility to scrutinize the record in its entirety to ascertain whether substantial evidence supports each essential administrative finding." *Walden*, 672 F.2d at 838 (citing *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir. 1980)); *see Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

**B.**  With respect to legal issues, "[n]o . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999.

## BACKGROUND

### A.    Procedural background

On June 13, 2019, Plaintiff Ditto applied for disability insurance benefits under Title II of the Social Security Act.  Doc. 7-6 at 2–8.  On June 14, 2019, Ditto also applied for SSI benefits under Title XVI of the Social Security Act.  Doc. 7-6 at 9–15.  In her applications, Ditto alleged that she became disabled on February 20, 2019.  Doc. 7-6 at 2, 9.

On July 24, 2019, the SSA initially denied Ditto's disability claim (Doc. 7-4 at 40; Doc. 7-5 at 9–14), and her SSI claim (Doc. 7-4 at 41; Doc. 7-5 at 9–14).

The SSA granted Ditto's request for a hearing (Doc. 7-5 at 23–27); and, on October 27, 2020, a hearing was held before an ALJ (Doc. 7-3 at 37–64; Doc. 7-5 at 40–44). A vocational expert or "VE"—Marilyn Stroud—also appeared and testified at the hearing. Doc. 7-3 at 37, 58–63.

On January 7, 2021, the ALJ issued an unfavorable decision, finding that Ditto was not disabled under the Social Security Act. Doc. 7-3 at 8–22.

On February 2, 2021, Ditto appealed that decision through counsel. Doc. 7-5 at 76–79. On June 8, 2021, the SSA Appeals Council denied Ditto's request for review, finding that there was "no reason under [its] rules to review the Administrative Law Judge's decision." Doc. 7-3 at 2.

After the Appeals Council denied Ditto's request for review (Doc. 7-3 at 2–5), the ALJ's decision became final for purposes of judicial review. *See* 42 U.S.C. § 405(g).

## B.    Factual background, and the ALJ hearing

Ditto was born on January 11, 1972. Doc. 7-3 at 21; Doc. 7-7 at 2. Ditto lives with her husband and her mother-in-law. Doc. 7-3 at 48.

In her initial applications for benefits, Ditto claimed that she became disabled on February 20, 2019 (Doc. 7-6 at 2; Doc. 7-7 at 2), and that she was unable to work

6

because of neck surgery, scoliosis, degenerative disc disease, back surgery, anxiety, and migraines (Doc. 7-7 at 6).  Ditto stated that she last worked on February 20, 2019 (i.e., her alleged disability onset date), and that she had to quit working because of her medical conditions.  Doc. 7-7 at 6.  She also stated that she only had 1 job in the last 15 years, in the industrial automotive industry, before she became unable to work.  Doc. 7-7 at 7.  In that job, Ditto frequently lifted 20 pounds and had to pull racks full of products.  Doc. 7-7 at 8.

On June 23, 2019, Ditto submitted an adult function report.  Doc. 7-7 at 24–31.  Ditto reported that, during a typical day, she would get up, take her medications, eat, bathe, fix food, watch television, and do laundry.  Doc. 7-7 at 24.  She reported that she sometimes keeps her five-year-old granddaughter.  Doc. 7-7 at 25.  Ditto also reported that some days her pain keeps her from sleeping, and that she has "migraines that keep [her] awake and sick."  Doc. 7-7 at 25.

Ditto reported that she makes her own meals on a daily basis, but that it "hurts to stand for a long period of time," which has changed her cooking habits.  Doc. 7-7 at 26.  She also reported that she is able to complete light household chores, such as laundry and dusting, but that she does "a little at a time."  Doc. 7-7 at 26.  Ditto reported that she cannot meet with her friends much, because she is "always hurting and can't ride 4 wheelers or do what they are doing."  Doc. 7-7 at 29.  She reported that "lifting, bending, and standing causes more pain in [her] lower back," and that

she often has to rest until "the pain eases up."  Doc. 7-7 at 29.

On June 21, 2019, Ditto's daughter—Julie Wright—submitted a third-party adult function report regarding Ditto's limitations.  Doc. 7-7 at 16–23.  Wright reported that she sees Ditto often, and that Ditto is able to bathe, eat, watch television, and do light housework on a daily basis.  Doc. 7-7 at 16.  Wright reported that in the past Ditto could lift heavy objects, raise her hands above her head, and complete normal daily activities without pain, but that Ditto is no longer able to do so because of her conditions.  Doc. 7-7 at 17.

Wright also reported that Ditto can prepare simple meals, but that "standing for a long period of time sometimes bothers her."  Doc. 7-7 at 18.  She also stated that "easy tasks take [Ditto] longer due to pain in [her] back when standing," and that Ditto needs "occasional help" with household tasks, "depending on [her] pain level."  Doc. 7-7 at 18.  Wright reported that Ditto only needs to stop and rest if she is "walking a long distance," but that she cannot lift any heavy objects, and "kneeling, standing, long time walking, etc. are painful."  Doc. 7-7 at 21.

At the October 2020 ALJ hearing, Ditto testified that she is unable to work because of chronic pain in her neck and her back.  Doc. 7-3 at 43.  Ditto testified that she last worked full time in February 2019, when she worked in production, operating machinery for Honda.  Doc. 7-3 at 55.  Ditto testified that she had to manually place parts onto car headrests, lift boxes, and place them on racks.  Doc.

8

7-3 at 55.  She performed that job for eight years, and before that she worked for five years calling businesses to set up their internet.  Doc. 7-3 at 55–56.

Ditto testified that, on the recommendation of her doctor, she had neck surgery in 2019 to address her pain.  Doc. 7-3 at 43–44.  She testified that "[t]he surgery was good, but [she] still ha[s] issues," including migraines, headaches, and pain.  Doc. 7-3 at 44.

Ditto also testified that she had seen Dr. John Feo at the Orthopaedic Center in Madison, Alabama earlier in 2020,[1] that Dr. Feo had told her that "everything looked good," but that more recently an MRI showed that she has a bone spur and another bulging disc.  Doc. 7-3 at 44–45; *see* Doc. 7-8 at 23–27.

Ditto testified that medication helps with her neck pain, and that her pain level with medication is 4–5 out of 10, while her pain level without medication is 8 out of 10.  Doc. 7-3 at 45.  As to her lower back pain, Ditto testified that with medication her pain is 6 out of 10, but that without medication it is 8 out of 10.  Doc. 7-3 at 46.  Ditto also testified that her doctors have recommended muscle relaxers for her neck pain and medication for her headaches and migraines.  Doc. 7-3 at 45.

Ditto testified further that she independently can care for her personal needs,

---

[1] Dr. John Feo completed an initial evaluation of Harris at the Orthopaedic Center in Madison, Alabama on January 23, 2020.  Doc. 7-8 at 23, 27.  Ditto presented with complaints of neck pain and some numbness in her right hand.  Doc. 7-8 at 23.  Dr. Feo "counseled [Ditto] about weaning off her rather large doses of narcotics," and "recommended some physical therapy and an anti-inflammatory."  Doc. 7-8 at 25.

such as bathing and dressing.  Doc. 7-3 at 46.  However, she also testified that she would need to "sit down and rest a minute to take the pressure off of [her] legs and back," after walking from her kitchen to her living room.  Doc. 7-3 at 46.  She testified that she would need to sit down after standing for 10 to 15 minutes because of "the pain and the pressure" in her back and legs.  Doc. 7-3 at 47.

Ditto testified that she has degenerative disc disease and severe scoliosis, that she can only lift 15 pounds, and that she can bend over but it is difficult to get back up.  Doc. 7-3 at 47.

Ditto also testified that she does chores in her home, including cooking and cleaning dishes, but that she has to lean on the counter.  Doc. 7-3 at 48.  She also testified that she has to lie down most of the time, but will fold some clothes "here or there."  Doc. 7-3 at 39.

Ditto testified that she has "six to eight" migraines in a month, which last on average "six hours or longer."  Doc. 7-3 at 49.  She testified that, when she feels a migraine onset, she takes preventative medication.  Doc. 7-3 at 50.  She testified that with the medication sometimes the migraines will "ease up," but "most of the time when it's got to the point I'm throwing up and I'm nauseated, no sound, no light."  Doc. 7-3 at 51.  She testified her doctor has stated that the migraines are related to her neck problems.  Doc. 73 at 51.  Ditto testified that every time she has a migraine she experiences nausea, and that she needs to stay "still, with no smell, no light, and

just try to sleep it off."  Doc. 7-3 at 52.

Ditto testified further that Dr. Thacker,[2] her doctor at a pain clinic, is suggesting back surgery, and that she recently had spinal injections, but that they did not provide "significant relief."  Doc. 7-3 at 52–53; *see* Doc. 7-8 at 139; Doc. 7-13 at 8–9, 14.

A vocational expert (or "VE"), Marilyn Stroud, also testified at the ALJ hearing.  Doc. 7-3 at 56–63.

VE Stroud described Ditto's past work as a machine operator on an automotive assembly line as a semiskilled job, performed at a medium level.  Doc. 7-3 at 57.  She described Ditto's past work as an order clerk at an internet company as a semiskilled job, performed at a sedentary level.  Doc. 7-3 at 57–58.

Stroud testified that a hypothetical individual with Ditto's same age, education, and work experience, who is able to perform a full range of light work with multiple physical limitations, would not be able to perform Ditto's past job as a machine operator, but would be able to perform her past work as an order clerk.  Doc. 7-3 at 58–59.  Stroud testified that a hypothetical individual with those same limitations also would be able to perform other jobs, including as a routing clerk, a marker, and a laundry classifier, all of which are available in significant numbers in

---

[2] Dr. James Thacker at Huntsville Pain Management (whom the hearing transcript refers to as Dr. "Packer") provides Ditto with treatment for chronic pain.  Doc. 7-8 at 70–142.

the national economy.  Doc. 7-3 at 60.  She testified that all of these jobs also would be available if the hypothetical individual had an additional physical limitation of "frequent fingering and handling with the right upper extremity."  Doc. 7-3 at 60–61.  If that hypothetical individual "could understand, remember and carry out simple instructions, could maintain attention and concentration for two-hour periods at a time, and [could] adapt to routine and infrequent workplace changes," the order clerk job would no longer be available, but that individual would be able to perform work as a routing clerk, marker, and laundry classifier.  Doc. 7-3 at 61.

Stroud also testified that, if the hypothetical individual were limited to a full range of sedentary work, with the same physical limitations, the individual would be able to perform several jobs in the national economy, including as an addresser, cutter and paster, and a document preparer.  Doc. 7-3 at 61–62.  But she testified that, if the hypothetical individual were "limited to sitting one of eight hours, standing and or walking three of eight hours," she would not be able to perform any of these jobs or any other full-time work.  Doc. 7-3 at 62.

### C.    The ALJ's decision

On January 7, 2021, the ALJ issued an unfavorable decision on Ditto's claims.  Doc. 7-3 at 8–22.  The ALJ found that Ditto is insured through December 21, 2023, and must establish disability on or before that date to be entitled to disability insurance benefits.  Doc. 7-3 at 11–12.

12

At step one of the sequential process, the ALJ found that Ditto had not engaged in substantial gainful activity since February 20, 2019, her alleged disability onset date.  Doc. 7-3 at 13.  The ALJ noted that Ditto earned $2,261 in the second quarter of 2019 (after Ditto's alleged onset date), but that amount did not rise to the level of substantial gainful activity.[3]  Doc. 7-3 at 11–12.

At step two of the sequential analysis, the ALJ found that Ditto had severe impairments of cervical and lumbar degenerative disc disease, lumbar scoliosis, degenerative joint disease, right-sided carpal tunnel syndrome, migraine headaches, and obesity.  Doc. 7-3 at 14.  The ALJ considered SSR (Social Security Ruling) 19-4p in determining that Ditto's migraine headaches are a severe primary headache disorder.  Doc. 7-3 at 14.  The ALJ also noted that, while Ditto had a history of hypertension, anxiety, and depression, the ALJ could not conclude that those medically determinable impairments were severe impairments for purposes of the disability determination.  Doc. 7-3 at 14–16.

At step three, the ALJ found that Ditto did not have an impairment or combination of impairments that met the severity of the impairments in the SSA's "Listing of Impairments"—"including specific Medical Listing 1.02B and 11.14 (degenerative joint disease and carpal tunnel syndrome), 1.04 (degenerative disc

---

[3] Ditto's quarterly wage unemployment query indicates that she earned $2,261 from HFI LLC in the second quarter of 2019.  Doc. 7-6 at 32.

disease and scoliosis), 11.02 and SSR 19-4p (migraine headaches), and 1.00Q and SSR 19-2p (obesity)."  Doc. 7-3 at 16.

At step four, the ALJ concluded that Ditto was unable to perform any of her past relevant work.  Doc. 7-3 at 20.  But (at step five), after considering Ditto's age, education, work experience, and "residual functional capacity" (RFC), the ALJ found that there were jobs in the national economy that Ditto could perform.  Doc. 7-3 at 21– 22.

With respect to Ditto's RFC, the ALJ found, "[a]fter careful consideration of the entire record," that Ditto "has the residual functional capacity to perform a reduced range of light work," that she "should never climb ladders, ropes, or scaffolds, but frequently climb ramps and stairs," that she "can frequently balance, as well as occasionally stoop, kneel, and crawl," that she "should never reach overhead, and avoid concentrated exposure to temperature extremes and vibration," that she "can perform jobs that do not require working with dangerous moving machinery, at unprotected heights, or commercial driving," that she "can frequently finger and handle with her right upper extremity," that she "can understand, remember, and carry out simple instructions," that she "can maintain attention and concentration for two-hour periods at a time," and that she "can adapt to routine and infrequent workplace changes."  Doc. 7-3 at 16.

Consequently, the ALJ determined that Ditto was not disabled under the

Social Security Act.  Doc. 7-3 at 22.  Because the Appeals Council found no reason to review the ALJ's opinion, the ALJ's decision became the final decision of the Commissioner.

## DISCUSSION

Having carefully considered the record and briefing, the court concludes that the ALJ's decision was supported by substantial evidence and based on proper legal standards.

## I.   The ALJ's decision properly was based on the multi-part "pain standard."

As an initial matter, the ALJ's decision properly was based on the multi-part "pain standard."  When a claimant attempts to establish disability through her own testimony concerning pain or other subjective symptoms, the multi-step "pain standard" applies.  That "pain standard" requires (1) "evidence of an underlying medical condition," and (2) either "objective medical evidence confirming the severity of the alleged pain" resulting from the condition, or that "the objectively determined medical condition can reasonably be expected to give rise to" the alleged symptoms.  *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002); *see also* 20 C.F.R. § 404.1529 (standards for evaluating pain and other symptoms).

Then, according to both caselaw and the applicable regulations, an ALJ "will consider [a claimant's] statements about the intensity, persistence, and limiting effects of [her] symptoms," and "evaluate [those] statements in relation to the

objective medical evidence and other evidence, in reaching a conclusion as to whether [the claimant is] disabled."  20 C.F.R. § 404.1529(c)(4); *see Hargress v. Social Sec. Admin., Comm'r*, 883 F.3d 1302, 1307 (11th Cir. 2018).

Here, the ALJ's decision articulated and tracked that controlling legal standard.  In analyzing Plaintiff Ditto's RFC (residual functional capacity), and the extent to which Ditto's symptoms limited her functioning, the ALJ's decision reasoned that the ALJ "must follow" the required "two-step process": (1) "determine[] whether there is an underlying medically determinable physical or mental impairment[] . . . that could reasonably be expected to produce the claimant's pain or other symptoms"; and (2) "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities."  Doc. 7-3 at 17.  Thus, the ALJ's decision was based on the proper legal standards.

## II.    Substantial evidence supported the ALJ's decision to discredit Ditto's subjective testimony regarding her pain.

Substantial evidence supported the ALJ's decision not to credit Ditto's subjective testimony regarding her back pain, neck pain, and migraine headaches.

### A.    The Eleventh Circuit requires that an ALJ must articulate explicit and adequate reasons for discrediting a claimant's subjective testimony.

Under controlling Eleventh Circuit law, an ALJ must articulate explicit and adequate reasons for discrediting a claimant's subjective testimony.  *Wilson*, 284

F.3d at 1225.   A claimant can establish that she is disabled through her "own testimony of pain or other subjective symptoms."   *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).

An ALJ "will not reject [the claimant's] statements about the intensity and persistence of [her] pain or other symptoms or about the effect [those] symptoms have" on the claimant's ability to work "solely because the available objective medical evidence does not substantiate [those] statements."   20 C.F.R. § 404.1529(c)(2).

So, when an ALJ evaluates a claimant's subjective testimony regarding the intensity, persistence, or limiting effects of her symptoms, the ALJ must consider all of the evidence, objective and subjective.   20 C.F.R. § 404.1529.   Among other things, the ALJ considers the nature of the claimant's pain and other symptoms, her precipitating and aggravating factors, her daily activities, the type, dosage, and effects of her medications, and treatments or measures that she has to relieve the symptoms.   *See* 20 C.F.R. § 404.1529(c)(3).

Moreover, the Eleventh Circuit has been clear about what an ALJ must do, if the ALJ decides to discredit a claimant's subjective testimony "about the intensity, persistence, and limiting effects of [her] symptoms."   20 C.F.R. § 404.1529(c)(4). If the ALJ decides not to credit a claimant's subjective testimony, the ALJ "must articulate explicit and adequate reasons for doing so."   *Holt v. Sullivan*, 921 F.2d

1221, 1223 (11th Cir. 1991).

"A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court." *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995); *see Mitchell v. Commissioner of Soc. Sec.*, 771 F.3d 780, 792 (11th Cir. 2014) (similar). "The credibility determination does not need to cite particular phrases or formulations but it cannot merely be a broad rejection which is not enough to enable . . . [a reviewing court] to conclude that the ALJ considered [the claimant's] medical condition as a whole." *Dyer*, 395 F.3d at 1210 (quotation marks and alterations omitted).[4] "The question is not . . . whether [the] ALJ could have reasonably credited [the claimant's] testimony, but whether the ALJ was clearly wrong to discredit it." *Werner v. Commissioner of Soc. Sec.*, 421 F. App'x 935, 939 (11th Cir. 2011).

---

[4] The Social Security regulations no longer use the term "credibility," and have shifted the focus away from assessing an individual's "overall character and truthfulness"; instead, the regulations now focus on "whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and[,] given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities." *Hargress*, 883 F.3d at 1308 (quoting SSR 16-3p, 81 Fed. Reg. 14166, 14167, 14171 (March 9, 2016)). But, generally speaking, a broad assessment of "credibility" still can apply where the ALJ assesses a claimant's subjective complaints about symptoms and consistency with the record. *Id.* at 1308 n.3.

**B.    The ALJ properly explained the decision not to credit Ditto's subjective testimony regarding her pain, and substantial evidence supported that decision.**

The ALJ properly explained the decision to discredit Ditto's subjective testimony regarding her pain, and substantial evidence supported the ALJ's decision. In her brief, Ditto argues that the ALJ "did not correctly evaluate the intensity and persistence of [her] back pain, neck pain, and migraine headaches." Doc. 12 at 12. However, the ALJ's decision not only articulated and tracked the multi-part "pain standard" (*see* Part I *supra*), but also tracked the Eleventh Circuit law and applicable regulations for evaluating a claimant's subjective testimony (discussed above in Part II.A *supra*).

In determining Ditto's RFC (and citing 20 C.F.R. §§ 404.1529 and 416.929 and SSR 16-3P), the ALJ's decision stated that the ALJ "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." Doc. 7-3 at 17. And, consistent with 20 C.F.R. § 404.1529, the ALJ's decision explained that, "whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, [the ALJ] must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities." Doc. 7-3 at 17.

The ALJ then reviewed Ditto's allegations and hearing testimony regarding

19

her back pain, neck pain, and migraine headaches.  Doc. 7-3 at 17–18.  The ALJ stated that Ditto "alleges she is unable to work due to neck surgery, scoliosis and degenerative disc disease, and migraine headaches" (Doc. 7-3 at 17; *see* Doc. 7-7 at 6), that Ditto "notes severe headaches that occur up to one time per month that last four hours" (Doc. 7-3 at 17; *see* Doc. 7-7 at 33), that she "indicates that her impairments affect her ability to sleep, perform personal care, prepare meals, perform household chores, perform yard work, drive, shop, and perform hobbies, as well as lift, squat, bend, stand, walk, sit, kneel, climb stairs, and concentrate" (Doc. 7-3 at 17; *see* Doc. 7-7 at 26–29), that she alleges she "is limited in her ability to walk prior to resting, has limitations in paying attention, has problems following instructions, and notes some problems handling stress and changes in routine" (Doc. 7-3 at 17; *see* Doc. 7-7 at 29–30), and that she "noted problems sitting, standing, or walking for long periods, as well as an inability to do anything during migraine headaches" (Doc. 7-3 at 17; *see* Doc. 7-7 at 41).

With respect to Ditto's hearing testimony, the ALJ's decision stated that Ditto "testified that she is unable to work due to pain in her neck and back" (Doc. 7-3 at 17; *see* Doc. 7-3 at 43), that Ditto "noted continued neck problems despite surgeries, as well as migraine headaches," that she "indicated that her pain levels are eight out of a possible ten," that she "noted she is limited in her ability to walk before sitting and notes limitations in her ability to lift," that she "indicated that she spends her

20

time lying down during the day, noting six to eight headaches per month," and that she "noted treatment that includes medication management and avoidance of light and sounds, indicating that she would miss seven to ten days per month due to migraine headaches that include symptoms of nausea and vomiting" (Doc. 7-3 at 17–18; *see* Doc. 7-3 at 44–51).

Then, "[a]fter careful consideration of the evidence," the ALJ found that Ditto's "medically determinable impairments could reasonably be expected to cause *some* of her alleged symptoms." Doc. 7-3 at 18 (emphasis added).

But the ALJ found that Ditto's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record"—for reasons that the ALJ explained in the decision. Doc. 7-3 at 18.

The ALJ's decision reviewed Ditto's medical records. The ALJ found that MRIs before Ditto's alleged disability onset date (i.e., February 20, 2019) showed degenerative disc disease of her cervical spine and mild degenerative disc disease of her lumbar spine in 2016, and degenerative disc disease of her cervical spine in 2018. Doc. 7-3 at 18; *see* Doc. 7-9 at 30; Doc. 7-12 at 51, 202–03. The ALJ found that diagnostic x-rays after Ditto's alleged disability onset date showed mild degenerative disc disease of her cervical spine in January 2020, cervical degenerative disc disease in July 2020, and lumbar scoliosis in February 2019 and

21

July 2020.  Doc. 7-3 at 18; *see* Doc. 7-8 at 25; Doc. 7-10 at 46; Doc. 7-8 at 134–35. In this regard, the ALJ's decision demonstrates that the ALJ considered what Ditto's brief characterizes as the "solid medical evidence" of Ditto's "chronic" neck and back pain.  *See* Doc. 12 at 14.

The ALJ found that medical records dated after Ditto's alleged disability onset date showed "complaints of chronic pain, neck pain radiating into her arms, low back pain, weakness, migraine headaches and migraine medication ineffectiveness," as well as "pain levels as high as six out of a possible ten that [Ditto] noted [were] exacerbated by lifting, climbing, and weather changes."  Doc. 7-3 at 18; *see* Doc. 7-8 at 2, 7, 12, 16, 23, 37–38, 40, 44, 46, 54, 70, 79, 87, 92, 100, 105, 110, 119, 136, 141; Doc. 7-10 at 7, 9, 30–32, 39.  So, notwithstanding the arguments in Ditto's brief, the ALJ's decision makes clear that the ALJ considered "medical signs" of Ditto's migraines, including "[w]hether [she] has received continuing and regular treatment for migraines," and "[w]hether [her] symptoms are consistent with those of migraine headaches."  *See* Doc. 12 at 13 (citations omitted).

The ALJ also found that "[e]xamination findings have included height and weight combinations that place [Ditto's] body mass index in the obese range, tenderness to palp[a]tion and decreased range of motion of her cervical and lumbar spine, . . . decreased lumbar muscle tone, a scoliotic curve, and spasms in her neck and back" (Doc. 7-3 at 18; *see* Doc. 7-8 at 72, 81–82, 90, 94–95, 102–03, 108–09,

116–17), that "[r]ecords detail treatment via medication management and injections, as well as a February 2019 anterior cervical discectomy and fusion at C5/6" (Doc. 7-3 at 18; *see* Doc. 7-8 at 37–39; Doc. 7-10 at 7–9, 12–17, 31, 39–41; Doc. 7-13 at 8–9), and that "[f]ollow-up treatment notes detail a hemangioma secondary to her surgery and indicate that the claimant was scheduled for follow-up physical therapy, while also indicating that she continued to have cervical spine problems following the surgery" (Doc. 7-3 at 18; *see* Doc 7-8 at 37–39; Doc. 7-10 at 29–35).

But the ALJ found that the same medical records "indicate that [Ditto] "continued to smoke cigarettes on an everyday basis despite counseling on the importance of smoking cessation with regard to her fusion," and that she consistently "had a daily activity level of nine out of a possible ten." Doc. 7-3 at 18. The ALJ found that Ditto had denied "decreased range of motion," among other things, and that "she was doing well on her medication regime" and "was sleeping well." Doc. 7-3 at 18. The ALJ also found that a July 2018 diagnostic x-ray "revealed minimal cervical spondylosis," a January 2020 x-ray revealed cervical degenerative disease, but "proper fusion," and a July 2020 x-ray "noted proper placement of [Ditto's] cervical spine hardware." Doc. 7-3 at 18–19; *see* Doc. 7-12 at 204; Doc. 12 at 9.

The ALJ found further that Ditto's medical records "include[] many relatively normal examination findings," such as "standing without difficulty," "full cervical range of motion," "only mild decrease[] in range of motion of her neck," and

23

"ambulation with a normal gait," among other things.  Doc. 7-3 at 19; *see* Doc. 7-13 at 4, 12, 18, 23.

Thus, the ALJ found that "a review of the entirety of the evidence of record supports a determination that [Ditto] is not disabled by her physical impairments." Doc. 7-3 at 19.  The ALJ found that, while "the record includes some abnormal examination findings and diagnostic testing that support the diagnoses," the record evidence "also includes many relatively normal examination findings that are inconsistent with the level of symptomology [Ditto] alleges."  Doc. 7-3 at 19.

With respect to Ditto's reports about her daily activities, the ALJ also found that her "admitted and indicated activities and abilities are inconsistent with the level of symptomology she alleges."  Doc. 7-3 at 19.  The ALJ found that Ditto's activities included "preparing meals, caring for her granddaughter, shopping, driving, and performing household chores that include laundry and dusting."  Doc. 7-3 at 19.  The ALJ also found that Ditto had testified that "her surgery went well," that after surgery she had pain levels of "four to five out of ten with her pain medications," and that she "earned $2,261 in the second quarter of 2019, which was after her alleged onset date."  Doc. 7-3 at 19.

The ALJ found that "the totality of the record is inconsistent with a determination that the claimant is disabled.  Instead, the relatively normal examination findings noted throughout the record, as well as the claimant's admitted

and indicated activities and abilities, support a determination that the claimant can perform a range of work related activities."  Doc. 7-3 at 19.

Importantly, the ALJ did not entirely discredit Ditto's testimony about her back pain, neck pain, and migraine headaches.  Instead (as noted above), the ALJ found that Ditto's "impairments can reasonably be expected to cause some limitation in her ability to perform these work-related activities, and that the record *did* support limitations to a range of work activities at the light exertional level."  Doc. 17-3 at 19.  Indeed, contrary to the argument in Ditto's brief, the ALJ specifically "factored into th[e] RFC" determination Ditto's "migraine headache limitations."  *See* Doc. 12 at 14.

Among other things, the ALJ found that "[t]he limitation to the light exertional level; the preclusion from climbing ladders, ropes, or scaffolds; and frequently climbing ramps and stairs, frequently balancing, and occasionally stooping, kneeling, and crawling all accommodate [Ditto's] degenerative disc disease, . . . migraine headaches, [and] lumbar scoliosis," that "[t]he preclusion from concentrated exposure to vibration and temperature extremes, reaching overhead, and the limitation to frequently fingering and handling with her right upper extremity further accommodate her . . . cervical spine problems," that "[t]he limitation to understanding, remembering, and carrying out simple instructions; maintaining attention and concentration for two-hour periods; and adapting to routine and

25

infrequent workplace changes accommodate . . . [Ditto's] migraine headaches," and that the "limitations consider the impact of . . . her migraine headaches under the guidance of Social Security Ruling 19-4p."  Doc. 7-3 at 19.

The ALJ also "fully considered the medical opinions and prior administrative medical findings," and considered opinion evidence from Dr. Gloria Sellman and Dr. Sanat Dixit (Ditto's treating physician, whom the ALJ's opinion refers to as Dr. "Dixon").  Doc. 7-3 at 20.  The ALJ found Dr. Sellman's opinion that Ditto could perform "a range of work activities at the light exertional level" to be "mostly persuasive," because that opinion was "generally consistent with both the evidence [Dr. Sellman] considered and the [other] evidence, including the normal examination findings and [Ditto's] admitted and indicated activities and abilities."  Doc. 7-3 at 20; *see* Doc. 7-4 at 2–39.

And, the ALJ found not persuasive Dr. Dixit's opinion that Ditto was not ready to return to work after her surgery.  Doc. 7-3 at 20.  The ALJ found that Dr. Dixit's opinion was "temporary," and that "a careful review of [Dr. Dixit's] and other records does not reveal an opinion by Dr. Dix[it] that [Ditto] was unable to work for the twelve-month durational requirement."  Doc. 7-3 at 20; *see* Doc. 7-10 at 29.

Finally, in determining Ditto's RFC, the ALJ considered the third-party function report submitted by Ditto's daughter (Julie Wright), but the ALJ gave that

report "little weight."  Doc. 7-3 at 20.  The ALJ found that some of Wright's observations were "consistent with [Ditto's] allegations," but that those same observations were "inconsistent with much of the objective evidence of record." Doc. 7-3 at 20.

Accordingly, the ALJ found that "the overall evidence of record does not support a determination that [Ditto] is disabled," that "[t]he record fails to document persistent, disabling loss of functional capacity resulting from [her] severe impairments," that the RFC determination "is supported by the overall evidence of record, including objective evidence, opinion evidence, and [Ditto's] indications and admissions as to activities and abilities," and that based on the "entirety of the record" Ditto "can perform a range of work."  Doc. 7-3 at 20.

In short, the ALJ's RFC determination accounted for Ditto's subjective testimony regarding her back pain, neck pain, and migraine headaches, and included the necessary "explicit and adequate reasons" for discrediting Ditto's subjective testimony that she could not work on account of her pain and migraines.  *Wilson*, 284 F.3d at 1225.  The ALJ "considered [Ditto's] medical condition as a whole," and the decision was not a "broad rejection" of Ditto's subjective testimony.  *Dyer*, 395 F.3d at 1210.

Moreover, substantial evidence supported the ALJ's decision not to credit Ditto's subjective testimony regarding her pain and migraine headaches, and to find

27

that she was not disabled.  As explained above, the ALJ's decision contains a thorough consideration of the record evidence, including Ditto's function reports and testimony, a third-party opinion from her daughter (Wright), Ditto's treatment history, the results of objective testing, the medications she was prescribed, and medical opinions included in the record.  The ALJ appropriately considered Ditto's testimony regarding her neck pain, back pain, and migraine headaches, and evaluated the objective medical evidence and other evidence to determine what limitations Ditto had because of her impairments.

Given the record evidence and the ALJ's analysis, the court cannot "re-weigh[] the evidence or substitute[e] [its] judgment for that [of the Commissioner] . . . even if the evidence preponderates against the [ALJ's] decision."  *Moore*, 405 F.3d at 1213 (citation and quotation marks omitted).

In sum, there is sufficient evidence in the record based on which a reasonable person would accept the ALJ's findings that Ditto's testimony was not consistent with the record, and that Ditto was not disabled.  *See Crawford*, 363 F.3d at 1158. Accordingly, substantial evidence supported the ALJ's decision.

## III.    Substantial evidence supported the hypothetical questions the ALJ posed to the vocational expert, and the VE's testimony.

Substantial evidence supported the hypothetical questions that the ALJ posed to the vocational expert, as well as the VE's testimony.  In her brief, Ditto argues that the ALJ erred in relying on the vocational expert's testimony because the

hypothetical questions that the ALJ posed to the VE did not include "a single hypothetical question that included the number of days [Ditto] might miss work, or the percentage of the workday she would be off task because of migraine headaches." Doc. 12 at 14.

"[F]or a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments." *Winschel*, 631 F.3d at 1180.  But, if substantial evidence supports the ALJ's finding that the claimant does not have a particular limitation, the ALJ need not include that limitation in a hypothetical question to the vocational expert. *Crawford*, 363 F.3d at 1161.

While Ditto's brief asserts that the ALJ erred in relying on the vocational expert's testimony, she argues only that her "frequent severe headaches would most likely affect her ability to stay on task," and that this case "should be remanded for the ALJ to reassess and better explain the impact of [her] migraine headaches on the RFC." Doc. 12 at 14.

But (as explained above), the ALJ specifically found in the RFC determination that, while Ditto could perform work at the light exertional level, limitations were necessary to accommodate her migraine headaches, as well as her other impairments.  Doc. 7-3 at 19.  And, the hypothetical questions that the ALJ posed to the vocational expert were consistent with that RFC determination.

Furthermore (and as also explained above), Ditto has failed to establish "the absence of substantial evidence supporting the ALJ's conclusion." *See Sims v. Commissioner of Soc. Sec.*, 706 F. App'x 595, 604 (11th Cir. 2017) ("Under a substantial evidence standard of review, [the claimant] must do more than point to evidence in the record that supports her position; she must show the absence of substantial evidence supporting the ALJ's conclusion."); *supra* Part II.B.

Consequently, the ALJ did not have to ask the vocational expert about any limitation that the ALJ had not found in the RFC determination—e.g., to assume that Ditto would be limited to sedentary work, or to assume a given number of absences per month. *See Crawford*, 363 F.3d at 1161.

Indeed, the ALJ's hypothetical questions to the VE accounted for limitations from Ditto's migraine headaches, including her capacity to stay "[on] task" even with "migraine headaches." *See* Doc. 12 at 14. For example, the ALJ asked the VE what types of work would be available at both a light and sedentary exertional level, if the hypothetical individual "could understand, remember and carry out simple instructions, could maintain attention and concentration for two-hour periods at a time, and [could] adapt to routine and infrequent workplace changes." Doc. 7-3 at 61. The ALJ also posed hypothetical questions that included multiple physical limitations. Doc. 7-3 at 60–61.

In turn, in assessing Ditto's RFC, the ALJ found that Ditto was precluded

from "climbing ladders, ropes, or scaffolds; and frequently climbing ramps and stairs, frequently balancing, and occasionally stooping, kneeling, and crawling" to accommodate her migraines, as well as her other impairments. Doc. 7-3 at 19. The ALJ also provided that Ditto's work would be limited "to understanding, remembering and carrying out simple instructions; maintaining attention and concentration for two-hour periods; and adapting to routine and infrequent workplace changes," which specifically would accommodate Ditto's pain and medication side effects, "as well as [her] migraine headaches." Doc. 7-3 at 19. Thus, the ALJ properly relied on the VE's testimony to determine that Ditto was not disabled.

In the end, "[b]ased on the totality of the record evidence, including the testimony of the vocational expert," the ALJ found that, "considering [Ditto's] age, education, work experience, and residual functional capacity, [she] is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." Doc. 7-3 at 22. Substantial evidence supported the ALJ's finding that Ditto was not disabled under the Social Security Act.

## CONCLUSION

For the reasons stated above (and pursuant to 42 U.S.C. § 405(g)), the court **AFFIRMS** the Commissioner's decision. The court separately will enter final

judgment.

      **DONE** and **ORDERED** this September 9, 2022.

_____
**NICHOLAS A. DANELLA**
UNITED STATES MAGISTRATE JUDGE